at all. Oral argument not to exceed 15 minutes per side. Mr. Patrick McLaughlin for the appellant. Good morning, your honors. Patrick McLaughlin on behalf of the claimants, Dr. and Mrs. Zaidi and pain management of northern Ohio. This record exposes raw, unchecked governmental power. The evidence in the record shows that three undercover operatives went into Dr. Zaidi's practice with the intent to deceive him about being in pain, subjective pain. They commenced on September 11th of 2012 and over a period of nine months made 16 visits. They paid $2,135 in cash. That represents proceeds of specified unlawful activity. On the strength of $2,135 in cash that the agents paid, which is alleged to be drug proceeds of the underlying offense, the government seized in October of 2013 14 business accounts. Retirement accounts, personal savings and checking accounts, and 139 pieces of personal jewelry of Mrs. Zaidi representing heirloom jewelry, the value of which was just under $5 million. You're talking about both the accounts and the jewelry. Yes, your honor. The jewelry was... $90,000 or something like that? $90,820 for the jewelry and the bulk of the financial accounts too were pain management of northern Ohio business accounts. The first merit account, which is very important here because the evidence in the record demonstrates that the $2,135 went into the first merit business account of PMNO. It was a second account that PMNO had, typically for transfers and for payment from insurance companies and Medicare and Medicaid. All the other accounts were personal accounts of Dr. and Mrs. Zaidi, including retirement accounts that represent a lifetime of accumulated assets. To cut to the chase, your clients are entitled to litigate the case, but they need to be present to do so, don't they? Your honor, that's another major issue here. I don't think they need to be present at a case management conference. I didn't see any cases there, but more directly to the court's question, that's where the fugitive disentitlement statute comes in. Dr. Zaidi and his family left in December of 2014 after he had attended the administrative hearing in District Court in Cleveland for two days on a long planned vacation. While he was visiting his family in Pakistan, he took ill. Now, by that time, Mrs. Zaidi and the children had returned to Cleveland. They were back in school. She then took the children out of school, went back to Pakistan to be with their ill husband. He had a heart attack in 2007, and he took ill, had complications. He's remained in Pakistan. Now, the government, very early on in the case, began raising the fugitive disentitlement statute, saying that that statute should bar the claimant's claims in this case because they weren't here. But the court didn't rule on that, did it? It didn't rule against you that way. Well, no. That's right, Your Honor. But let me explain it this way. It doesn't have anything to do with the case. Well, Your Honor, it does.  which held that you can't disentitle a civil claimant who's abroad and had been charged with an offense and could not be expedited. And because of that, Congress passed the fugitive disentitlement statute in the year 2000. And the statute provides, and when the government first raised it, they raised it even before they had decided to take the case to a grand jury against Dr. Zaidi. And, of course, Mrs. Zaidi has not been charged with anything, so the statute does not apply to her. But the statute provides that if an individual is advised that they've been charged and there's a warrant for the arrest, and either they leave the country or they refuse to enter, in order to avoid prosecution. And, of course, Dr. Zaidi had been out of the country for a number of months, actually even before the civil in rem action was filed, but he was out of the country for seven or eight months before the government elected to go to the grand jury and get an indictment. And so we put on evidence of his health condition, a heart attack in 2007 from Hillcrest Hospital in Cleveland, and a letter from Dr. Zaidi. Your Honor, it's totally undisputed. We filed a motion for partial... The doctor said he couldn't fly or something like that. Well, he had a letter from a doctor in Pakistan who he was able to see, even though he has no medical insurance and no assets, because the government took everything this family has. They have medical insurance in Pakistan. I thought that everybody got medical care over there. Well, I can't attest to the standard of care in Pakistan, Your Honor. The court offered to release some of the assets so that Dr. Zaidi could receive treatment, and he never availed himself of that opportunity. I'm not sure what that says. I don't know if that says that undermines the credibility of his claim, or it says he wasn't in the need he represented he was in, or I just don't quite know what to make of that. But, I mean, that did happen. Well, Your Honor, but at the same time, if you look at this record, you will see that when claimants filed their motion to transfer assets to pay lawful taxes, and this record shows that they paid their taxes every year, we put in declarations from their tax accountant to that effect, not to release it to claimants, but to transfer it from one governmental pocket to the other. The government opposed it, cited the statute, and says under the hardship provision of the statute, the claimants are not entitled to receive any of this money. The district court agreed with them, and frankly said that there's nothing in the statute which would allow release to the claimants. But we had not asked for that. We had asked for the transfer. And now, having won that issue . . . Well, it's not directly to their pocket, but it's to their benefit. It would be to their benefit. But it's their money. I mean, at the end of the day, it had not been forfeited. It had been seized. And on this record, we've established that the $2,135 was all deposited into one business account. There is no evidence in the record . . . To tie the other, right. None, Your Honor, or to the jury, frankly. And we challenge that. I mean, the . . . But we're still back to Judge Gibbons' important question about what's a court to do with folks who won't show up? Well, it's real . . . Sick, not legitimately sick, let's say. He can't defend himself. Well, that's where the fugitive disentitlement statute comes in. When the Supreme Court made the decision . . . Can you get to the bottom of the line of that statute? Your point is it doesn't apply? No. Well, first of all, let me step back, Your Honor. And I appreciate the question. In this Court's decision in Salte, which is the controlling decision in this circuit, which we followed and we briefed in the court below, the United States Attorney's Office in Cleveland litigated that case. They know what Salte is. They know what Salte holds. And in that case, there was a gentleman in Jordan. He had been ill. He had a letter from a doctor, and the court below had said that the government had proven that they had refused to enter the country in order to avoid prosecution. And this court said, no, that's not the case, because there are medical reasons which are in the record indicating why this gentleman can't travel back. But Salte appears to be a criminal case, or is it? Well, Salte is like this case, Your Honor. It's both civil and criminal. This case is not a criminal case. This case is a civil case, and your clients are in the position of plaintiffs in the case, even though the government was the initial plaintiff, because they are the claimants. They are bringing a claim. Well, it's a claim to their assets, Your Honor. Right, but it's their claim. Well, it's their assets that have been seized, but the government has the burden by a preponderance to demonstrate that the assets are forfeitable, and they have to show . . . But that doesn't mean your clients wouldn't have an obligation to appear when required by the district court to do so. Well, there are two issues there, Judge. Who is ultimately entitled to the assets is a totally another question from this. I mean, we're just looking at the propriety of the dismissal for want of prosecution. Well, except, Your Honor, we filed a motion for summary judgment, and we presented evidence . . . Well, and the district court determined that it was filed prematurely and that under the circumstances, when you are absenting yourself from the court for whatever reason, valid, invalid, it was inappropriate to proceed on that, and inappropriate as well to require the government to just furnish you every bit of evidence it had in support of both this case and the criminal case when you had not appeared. Your Honor, the government could have moved to stay the civil case. They made the strategic decision not to do that. They decided to go forward with the civil case, notwithstanding . . . Well, it's clear that the district court did the government's job for them by ruling on Rule 41. Actually, when you look at the court's order denying the claimant's motion for partial summary judgment, you will see that the court doesn't address Rule 56, doesn't address the Rule 56 standard, doesn't even mention Rule 56, permits the government to stand on the mere allegations of the complaint, and doesn't address any of the evidence that we submitted. As long as I've been practicing in federal courts, it's black-letter law that when a motion for summary judgment is filed, the court has to address it. In fact, the rule says the court shall grant summary judgment when the evidence justifies it. Now, the government was then under the responsibility to come forward to show that there are genuine issues . . . We know that the court has the ability to time the consideration of motions. I just looked through your brief, and I have just this one comment, really more of a comment in closing. I did not see one single reference to the fugitive disentitlement statute and how it applies in this case. We still are waiting to find out, but you do have rebuttal time. We briefed it, Your Honor. Thank you. All right. Thank you. Good morning. May it please the court, my name is Philip J. Trippi. I'm an assistant U.S. attorney with the Northern District of Ohio office, and I represent the plaintiff-appellee, United States of America, both here and in the lower court proceedings. Is it your argument, counsel, that in answer to Judge Gibbons' query, that the fugitive disentitlement statute was argued? Early on . . . Or in this brief? Well, no, I don't believe it's . . . In the gray brief. Judge Cook has pointed out to me that there is some reference to it in the reply brief, although not in the . . . Yes, Your Honor. I believe, too, the fugitive disentitlement came up towards the end of the claimant, Zaidi and his corporation, had argued in the document that they called The Record Presents the Antithesis of a Wanted Prosecution, had started arguing that we didn't meet the requirements of the fugitive disentitlement statute. And the court, as this court's aware, the district court ruled that that's inapplicable or irrelevant to these proceedings because I'm not reviewing it for that purpose or for dismissal or striking the claim on that basis. Now, when Mr. Zaidi filed his motion for summary judgment, was there proof that it was based upon? What did the record look like at that time? Your Honor . . . Did he have affidavits in the record or depositions or anything like that? No. As a matter of fact, the case management conference had not occurred yet. And under local rules in the Northern District of Ohio, the discovery is not to commence. Formal discovery doesn't even commence until there's a successful case management conference. Can you have a case management conference in a civil case without one of the parties being there? You can. The local rules require that . . . Surely that you can because you have people from California or Canada or somewhere. They can be represented by a lawyer, can't they? Exactly. In this case, the district court immediately did grant the claimant's first request at the initial 2014 scheduled CMC. The court did grant that. We filed a brief afterwards for consideration, pointing out the fact that the government had learned that the Zaidis had picked up taking their kids out of school and left. We were concerned that in light of the criminal proceedings that were . . . Excuse me, there weren't proceedings yet, but the criminal investigation that was ongoing, that it appeared that the fugitive disentitlement statute might be applicable at some future time. Let me ask you this question. Certainly, as a general matter, a plaintiff or a claimant in this case has to comply with the court's requirements about the party's personal presence. On the other hand, in this particular case, it doesn't really look like anything's happened in the civil litigation other than perhaps Ms. Zaidis taking the Fifth Amendment in response to her deposition being noticed. Attempting to exercise her Fifth Amendment right would require their presence except perhaps that. Arguably, the district court in being insistent on their personal presence was doing a bit of the government's work in attempting to obtain their presence back in the United States. What do you say about that view of the case? Well, Your Honor, I think it gets back to the point I would have originally made if I hadn't been asked the question. That is that from the inception of this case, at least from the time the first case management conference was scheduled back in 2014, there were two things that were abundantly clear to Claimant's Counsel and to the United States Counsel. That was that the district court took the position from the very first pre-trial that we had, delaying the CMC, that number one, it was not going to allow the claimants in this case to litigate the merits of their claims from outside of the United States and indicated it would give reasonable time, but both parties were told that the claimants to litigate the merits of their complaint would have to return to the United States. Could that position have . . . was that a meritorious position? Could the court ultimately dismiss for one of prosecution on that basis? Certainly, if you'd been about to have a trial or . . . The court was justified in dismissing this case not only under Rule 41, one of prosecution, but also the conduct of the parties also allowed the court to dismiss it under Rule 37 or Rule 16. Sanctions available, if a party fails to come to a scheduled conference, the court is empowered by those rules to dismiss the claim. It also puts a burden on the party to act in good faith. Do you think the court could dismiss a case against somebody, say, in which he was sued by the government and sent his lawyer to the pretrial conference? I believe this court . . . number one, they would have to request permission to avoid personal appearance, and they would have to receive that from the court, district court. In your experience, is it typical for parties to have to appear at a pretrial conference? In my experience, based on the facts that were before the district court that were being raised at all these status conferences, this is more than a year effort by the district court to get some indication that either Aram or . . . The situation with criminal sanctions pending and the foreign country distinguishes this from California. Is that what you're trying to get to? I'm trying to say that whether or not we had the future of disentitlement statute as a potential remedy down the line, the remedy that was here was that the government had expressed from its initial briefing in this case that it was concerned that it was going to be engaged in producing all kinds of early and broader discovery than was entitled to . . . that Dr. Zaidi was entitled to receive under the criminal proceedings. The indictment originally had not even been filed at that point in time. Isn't it a bit unusual to file the forfeiture action at this stage? Your Honor, the civil forfeiture action is often triggered by the fact that when we seize property, and there were seizure warrants, there was probable cause of termination in this case, that based on some notice that was given 90 days from that notice to either file an indictment and or file a civil complaint. In this case, the criminal indictment was not yet ready to be presented, so the United States . . . You were required to file the . . . Under Rule G in the 983, we had time limits that required that we proceed. Sometimes those cases are allowed basically just to sit there until the Your Honors will find, I believe it's in Section 983 of Title 18, will find that there is a procedure by which the proceedings can be stayed pending resolution of a criminal indictment. There's two concerns. One, the government's concern about having to provide discovery in a broader context, a civil context, than he would be entitled to under criminal. Two, from the person who's potentially facing criminal sanction, that based on the Fifth Amendment right, that he not be compelled to engage in discovery until the criminal case was resolved. If this matter had proceeded . . . If Mr. Zadie had been present in the country, it would have proceeded first under the criminal case, most likely. I believe the court would have stayed it. Both parties initially agreed to a stay of proceedings pending the filing of the indictment because we realized that there were issues that weren't going to be able to be resolved. What the court needs to look at is the repeated efforts by the district court to get them to comply. Most importantly, we had serious concerns about Aram Zadie. We had information that we had not yet shared in discovery because there hadn't been discovery yet. As we expressed those concerns that we wanted to depose her, especially as to whether she had standing or true ownership interest in the assets that had been seized that were in her name or in hers and her husband's name, we were basically told by the court that he was going to require that Aram Zadie had to come back. She wasn't under criminal sanction. We identified that she was not a target of any investigation. We simply needed to get through there. You said she couldn't come back because it was a hardship or something like that? Yes. She responded that she couldn't come back because the travel advisory said that no one should go to the airport. But the same travel advisory told all American citizens, no matter what, to get out of Pakistan as quickly as possible. So that was the first issue. She was an American citizen actually. She's an American citizen. I believe she also had Pakistani citizenship as well. I believe they both had dual citizenship. Did the judge accept that reason, excuse for not coming back, or did he say that's a poppycock? No, he basically said she's going to have to come back, and then he proceeded to give like a six-week time delay to allow her to have time to come back. The other thing that she said, which was a complete misrepresentation, was that her husband was so ill that she was the sole caregiver. The government pointed out that she couldn't be the sole caregiver because their whole claim was that they were living with extended family in Pakistan and that there were other people to protect. But what's important here, when the court characterizes her as having strung along the court in its later order of dismissing, what's important here is that she misrepresented the situation. When the court had Mr. Zaidi on the phone and actually had him making representations, we found out that he has a nitroglycerin pill if he needs it, he has aspirin, and beta blockers. He didn't have anything that required that he couldn't function or take care of his children or anything of that sort. So her representations were directly opposed to his later representations that he may need some surgery, but he needed to get an angiogram or a test. That's when the court offered the extraordinary, I would say, gracious remedy that he turned to us, as he's telling us, and he said, the government will release whatever funds the court orders to pay for whatever medical treatment Mr. Zaidi feels he needs, and without requiring that he come back to the United States to get that. So he was free to get it in Pakistan, he was free to travel to Europe, wherever the medical system was. What was he supposed to do to get that money then? Was he supposed to have a doctor say, here's what you need and here's what it's going to cost, or where did it go from there? The court was willing to take him at face value at that point in time and said that he would allow a petition by the claimant indicating that he needed release of funds to get whatever testing and or subsequent treatment that would enable him to be able to freely travel back to the United States. So the court basically took a humanitarian approach to this and again directed at us and suggested that he didn't expect the government to object to that type of release. What was the next step? Did he ever do that? He never did. Blank? He never did. The court said he was silent, as a matter of fact, and the court notes that in its final order, dismissing his claim, that he never even acknowledged, let alone take advantage of the court's offer to release whatever funds were necessary for him to get the type of medical treatment. And we assume, too, this is not a situation where this is an ignorant individual as far as knowing what the medical condition is. This is a practicing physician or was a practicing physician and would certainly be in a good position to know what type of treatment he needed and what was necessary. So the court at every juncture attempted to free up any impediments to their ability to travel. And in response to one of the earlier questions, please note that the court gave Aram Zaidi a number of chances and instead of coming back after the six weeks, four days before we were supposed to have the conference at which we were directed to depose her and we were limited to only a day and a half of deposition, all to accommodate her schedule so that she could get right back to her family. How was that done? On telephone? That was done, I believe, Your Honor, on a telephonic conference and it's represented in the minute notes, too, that the government was to notice the deposition of Aram Zaidi. It was discussed a number of times, including when it was moved from the January date to the February date. Each time, you know, the court tried to give her an opportunity to make travel arrangements, understanding she was coming from Pakistan and not from California or Indiana to appear. And, you know, the court was basically saying, she has to engage in some sort of discovery. And if not, there's going to be this adverse inference that's going to be drawn from, of course, the court's aware that she attempted to assert a blanket Fifth Amendment privilege, which the district court said he would not accept and, under the applicable law, shouldn't have accepted. She basically wanted to have it her way. And what the government would suggest to the court, and my final comment is, that whether we had 17 months, as the court gave, or 17 years, it's pretty clear from the record, from the type of contumacious behavior that was engaged in by both claimants, that there was never going to be an intent that these people were going to come back. So it would be an absurd result to suggest that the court couldn't at some point dismiss the case for want of prosecution. And that's what the court did, and only after repeated warnings, first to Aram Zaidi, secondly to Dr. Zaidi and his corporation, that Dr. Zaidi would have to appear in a reasonable time. And finally, it should be noted that the court said, set a deadline at some point, a couple months in advance. It will have to occur by June 8, 2015. Thank you, Your Honor. Your Honor, this court's decision in Salte controls here, and the government began briefing the fugitive disentitlement statute very early on. We addressed it, and we demonstrated, and this record demonstrates, a letter from a medical doctor in Pakistan. Did you brief it here for us? Yes, it's here, Your Honor. What page might that be? In the first brief? Well, it's set forth certainly in our reply brief. That's where it is. Well, it is there. It's in the record below, and it's in our reply brief, and we talk about the fugitive disentitlement statute. There were a number of pleadings below, which we cite to, and we're actually the court, and we raised this. The court relied on the fugitive disentitlement statute in one of its orders having to do with releasing seized funds, and so we briefed it because the Salte case is very similar to this case. In the Salte case, and the government... In what way is it like, this case? Well, Your Honor, in that case, the individual was, I believe, in Jordan, and this was a case in Northern District of Ohio, and he didn't come back to the United States. He made a record about his medical condition and his inability to travel, and that was raised. The district court disentitled him under the fugitive disentitlement statute. This court in the Salte case reversed and said that, no, the record demonstrated that there were medical reasons why he had not returned to the United States, and that the government had not challenged those. But this court, I thought you said, didn't use the disentitlement statute. Well, this court did in the Salte case, but below, initially, Judge Polster did talk about fugitive disentitlement. He raised it specifically in one of his early orders. Once we briefed it and put on the letter from a doctor in Pakistan attesting to Dr. Zaidi's medical condition, he had a heart attack, and then he had complications in Pakistan. Now, of course, he's there without any medical coverage or any way to get treatment, but a medical doctor, we put evidence in the record. What sort of complications did he have? Well, I mean, heart complications, but there are different kinds of heart complications. Well, he had a heart attack in, I think it was 2007, and we put evidence in the record. That was before any of this happened. No, no, but it indicated he had a heart condition, and that he had an exacerbation. He flew to Pakistan after he had this heart attack. Yes, yes, he did, Your Honor, and while he was there, then he had complications, and we put a letter from a doctor in Pakistan, very much like Salte. I mean, it's very much like what this court looked at in the Salte decision. Do you have any information about what the complications were? Yes, well, they're in the record, but yes, it was that he was having a heart, he had heart complications secondary to his heart attack, and that he was advised against any travel because of the health. It's all in the record, and once the government saw this, then they backed away from the fugitive disentitlement statute, and so did the court, frankly, because the court initially raised it in one of its orders. Your time's up. We appreciate the argument both of you have given, and we'll consider the case. Thank you, Your Honor.